**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| CARL KOYI, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 19-15605 (GC) (DEA) |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF MONMOUTH, et al., | : | **OPINION** |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CASTNER, District Judge**

This matter comes before the Court on a motion for summary judgment brought by Defendants Brian McMenemy, Robert Felix, James Fitzgerald, Michael Gall, and Paul Tenorio ("Defendants"). Defendants' seek dismissal of Plaintiff Carl Koyi's ("Plaintiff") Amended Complaint, which alleges that Defendants used excessive force and discriminated against him at Monmouth County Correctional Institution on May 23, 2019. For the reasons explained below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.  FACTUAL BACKGROUND & PROCEDURAL HISTORY

### a.  Material Facts

It is undisputed that on May 22, 2019, Plaintiff Carl Koyi ingested between 4 and 10 doses of LSD and an unknown quantity of heroin. (*See* Defendants' Statement of Undisputed Material Facts "DSUMF" at ¶¶ 1-3 (Citing Plaintiff's Deposition ("Pl. Dep.") at 61:24-63:101; 68:9-11; 63:14-24).) Shortly thereafter, the New Brunswick Police stopped the vehicle Plaintiff was traveling in for a motor vehicle violation and arrested Plaintiff and his girlfriend Cheryl for warrants issued out of Howell Township. (*Id.* at ¶¶ 5, 7 (citing Pl. Dep. at 64:5-19; 64:20-65:8).)

Plaintiff testified that the drugs had not yet gotten into his system at the time of his arrest.  (*Id.* at ¶ 6 (citing Pl. Dep. at 64:12-19).)

Members of the Howell Township Police Department transported Plaintiff and his girlfriend to Monmouth County Correctional Institution ("MCCI").  (*Id.* at ¶ 8 (citing Pl. Dep. at 68:20-69:12).)  The video surveillance provided by Defendants shows Plaintiff in the booking area where he saw medical staff and underwent a cursory search.[1]  (*Id.* at ¶ 10-11 (citing Ex. C, Slide 2; Pl. Dep. at  294-7-13).)  Plaintiff testified that he told the booking nurse that he had PTSD and "was tripping."  (Pl. Dep. at 88:14-89:24; *id.* at 94:18-22.)

The surveillance video also shows that Plaintiff was separated from his girlfriend and moved to a shower area to change.  (DSUMF at ¶¶ 11-12 (citing Ex. C, Slides 2-3).)  Afterwards, Plaintiff was placed in a holding cell.  (*Id.* at ¶ 17 (citing Ex. C, Slide 4).)

Around 1 a.m. on May 23, 2019, Plaintiff was taken to an area of booking to be processed by medical personnel.  (*Id.* at ¶ 20 (citing Exhibit C, Slides 5-6).)  Defendant Sergeant Michael Gall was working as the Booking Supervisor on the midnight shift, and he contends that Plaintiff was acting belligerent, speaking oddly, and refusing to follow commands to sit calmly and quietly. (Certification of Michael Gall, at ¶¶ 3-5.)  In the surveillance video, Plaintiff laid down on the ground several times; he then got up suddenly and moved in the direction of a female prisoner and/or an ajar door.  Officers immediately surrounded Plaintiff, brought him to the ground to restrain him, and placed him in handcuffs.  (DSUMF at ¶¶ 30 (citing Ex. C, Slide 5).)

Plaintiff testified that he initially thought the female prisoner was his girlfriend, and when he "jumped to the door" he was not in his right mind and was "trying to get out."  (Pl. Dep. at

---

[1] Defendants have produced video surveillance of several areas within MCCI, which they converted to a PowerPoint presentation.  (*Id.* at ¶ 9 (citing Exhibit C).)

123:20-126:9; *see also* Pl. Dep. at 130:15-25.)  Plaintiff also testified that he was punched and felt "boots" when the officers restrained and cuffed him in the booking room.  (*Id.* at 118:22-119:15; *see also* 126:12-129:25.)  Plaintiff further testified that he put his hands on his head and does not recall whether he resisted having his hands put in cuffs, but he also acknowledges that he may have resisted because he feared being punched.  (Pl. Dep. 131:12-136:16.)  In the surveillance video, the officers subdued and cuffed Plaintiff very quickly, and no one appears to have punched or kicked Plaintiff.  (*See* Ex. C, Slide 5.)

Defendants Gall decided to transport Plaintiff to the "Constant Watch" section of MCCI, which consists of secure cells near the main Medical Department.  (Gall Cert. at ¶¶ 5-8.)  According to Defendant Gall, prisoners are housed in Constant Watch for mental health or other issues requiring a higher level of supervision, and prisoners in Constant Watch are consistently monitored via video.  (*Id.* at ¶ 8.)  Due to the risk of self-harm, prisoners in Constant Watch are issued a specialized smock and may not wear a standard jumpsuit.  (*Id.*; *see also* Pl. Dep. at 165:1-14 (referring to the garment as a "turtle suit").)

In the surveillance video of the hallway, Plaintiff fell to the ground twice before Defendants placed him in a wheelchair and fastened the restraints.  (*See* Ex. C, Slides 7, 8.)  The parties dispute whether Plaintiff was capable of walking.  According to Gall, he and other officers attempted to walk Plaintiff to Constant Watch but Plaintiff refused to walk under his own power, and the Defendants placed him on the ground.  (DSUMF ¶ 38 (citing Gall Cert. at ¶ 9).)  The Defendants picked Plaintiff up, but he still refused to walk, and Gall decided to place Plaintiff in a restraint chair, which has a harness and hand and foot restraints.  (DSUMF at ¶¶ 40-41, 43 (citing Gall Cert. at ¶¶ 9-11).)  In his testimony, Plaintiff denied refusing to walk and testified that Defendants pushed him headfirst through the metal door, causing him to hit his head on the door prior to entering the

3

hallway; Plaintiff further testified that he may have lost consciousness, causing him to fall in the hallway.  (Pl. Dep. at 96:24-98:2; 143:9-145:13.)

Defendants had to take a lengthy route to Constant Watch because Plaintiff was in the restraint chair, but it appears undisputed that Plaintiff was transported to Constant Watch without further incident.  (DSUMF at ¶ 44 (citing Gall Cert. at ¶ 12; Ex. C, Slides 9-16).); *see also* Pl. Dep. 154:23-155:22.)

According to Defendants, Plaintiff was belligerent when he arrived at Medical and was shouting "Cheryl" (his girlfriend's name) and "in the main vein."  (SUMF at ¶¶ 46, 47 (citing Ex. F, Medical Chart Notes.)  Plaintiff testified that he had no independent recollection of his visit to Medical but did not deny that he was shouting his girlfriend's name and "in the main vein."  (Pl. Dep. 160:5-161:17; 191:15-24.)  In the surveillance video, which has no sound, Plaintiff is talking as medical staff are examining him.  (*See* Ex. C, Slide 17.)

Defendants next transported Plaintiff to the constant watch cell and attempted to remove Plaintiff from the restraint chair and change him into the required smock; however, Defendants contend that Plaintiff resisted those efforts.  (DSUMF ¶¶ 49-50 (citing Ex. C, Slide 19; Gall Cert. at ¶¶ 14-19).)  Defendants concede that Officers Tenorio, Fitzgerald, and McMenemy struck Plaintiff multiple times to overcome this alleged resistance to being cuffed, and Sergeant Gall deployed ARS, an aerosol chemical agent to Plaintiff's face.  (*See* DSUMF at ¶¶ 52 (citing Gall Cert. at ¶¶ 14-19).)

Plaintiff testified that after Defendants unfastened his restraints, Defendant Tenorio lost his grip on Plaintiff, and Plaintiff fell to the ground.  (Pl. Dep. at 212:3-22.)  The surveillance video appears to confirm that Defendant Tenorio lost his grip or dropped Plaintiff as they lifted him out of the chair, and three of the Defendants (Tenorio, and, presumably, Fitzgerald and McMenemy),

then converged on Plaintiff as they moved into the corner of the cell and mostly out of the camera's view.  (*See* Ex. C, Slide 19.)  Plaintiff testified that Defendants started punching him once they were on top of him in the corner of the room.  (Pl. Dep. at 215:10-15.)  In the video, one of the Defendants pulled on Plaintiff's legs, and the other three Defendants lifted Plaintiff partially onto the bed, but Plaintiff slid or is pulled back to the floor.  (*See* Ex. C, Slide 19.)  The video shows one of the Defendants striking Plaintiff repeatedly.  (*See id.*)  Two Defendants pulled off Plaintiff's jumpsuit, as Defendant Tenorio straddled Plaintiff's body.  (*Id.*)  Defendant Tenorio then struck Plaintiff multiple times in the face or head, and, by this point, there was a significant amount of blood on the floor.  (Ex. C, Slide 19, Pl. Dep. 213:11-216:25.)  Defendant Gall then deployed the ARS to Plaintiff's face.  (Ex. C at Slide 19; Pl. Dep. at 217:13-15.)  It appears that Defendants then cuffed Plaintiff at his hands and feet and dragged him out of the room.  (Ex. C, Slide 19.)

In his testimony, Plaintiff repeatedly denied resisting during the altercation in the constant watch cell.  (Pl. Dep. at 215: 23-25; 226:1-9.)  Plaintiff also testified that during the assault, one of the Defendants called him a "fake ass white Muslim" and asked him: "Where is Allah now?"  (Pl. Dep. at 184:11-25.)  Defendants deny making or hearing these remarks.  (DSUMF at ¶ 54 (citing Gall Cert. at ¶ 21).)

After the altercation, Defendants placed Plaintiff back in the restraint chair and wheeled him back to Medical.  (DSUMF at ¶ 57 (citing Gall Cert. at ¶ 19.)  In the surveillance video, Plaintiff is strapped in the restraint chair unclothed and has what appears to be a towel wrapped around his head.  (*See* Ex. C, Slide 20.)  Plaintiff testified that medical staff washed the pepper spray off with water but provided him with no other medical treatment.  (Pl. Dep. at 230:2-231:25.)

Plaintiff was released from MCCI on May 23, 2019, and sought medical treatment at Centrastate Hospital.  (DSUMF ¶¶ 60-61 (citing Pl. Dep. at 238:10-25; 239:4-8; Ex. H, Centrastate Medical Records).)

Two months later, on July 19, 2023, Plaintiff gave a voluntary interview about the incident to William Beckenstein of the Monmouth County Sheriff's Office, which was transcribed into a "Statement."  (DSUMF at ¶¶ 74-76 (citing ECF No. 76-3, Ex. B).)  In the Statement, Plaintiff claimed that the beating began in the booking room or the medical department after he tried to give his girlfriend a hug.  (*See* Ex. B at 2.)  Plaintiff further claimed that the beating continued "in a back room" where the officers "continued to beat the shit out of me, maced my whole body."  (*Id.*)  Plaintiff also claimed in the Statement that Defendants called him a "fake ass white Muslim" and said: "where is Allah now."  (*Id.*)

In his deposition, Plaintiff attempted to reconcile the discrepancies between his Statement and the video evidence.  (*See e.g.*, Pl. Dep. at 111:20-119:15.)  Plaintiff testified that he has PTSD that makes it difficult to remember events and that his drug use and resulting intoxication also made it difficult for him to recall the incident on May 23, 2019; Plaintiff also testified that he told the truth to Beckenstein as he remembered it but only remembered "bits and pieces" of the incident.  (*See* Pl. Dep. at 83:23-84:22.)  Plaintiff also admitted that his current memory is influenced by the video surveillance he received from Defendants.  (*See id.* at 84:23-85:13.)

### b.  Procedural History

Plaintiff filed his original pro se Complaint on July 18, 2019.  (ECF No. 1.)  At the screening stage, the District Court construed Plaintiff to raise claims pursuant to 42 U.S.C. § 1983 and proceeded Fourteenth Amendment excessive force and equal protection claims, as well as a First Amendment retaliation claim against Defendant McMenemy (who is improperly identified

as "CO Mc Mememene" and 25 John Doe Defendants. (ECF No 5 at 1-3.)  The Court also proceeded an inadequate medical care claim against a John Doe Doctor.  (*See id.*)  The Court dismissed without prejudice the claims against the County of Monmouth and the Medical Provider. (*Id.*)

On July 29, 2021, the Magistrate Judge granted Plaintiff leave to submit an Amended Complaint, and Plaintiff filed his Amended Complaint on September 16, 2021.  The Amended Complaint names Robert Felix, James Fitzgerald, Michael Gall, and Paul Tenorio but omits Brian McMenemy, who was named in the original Complaint.  (ECF No. 46 at 2-5.)  The Amended Complaint is extremely sparse and states the following facts:  "I was assaulted by these officers while in custody and also was discriminated [a]gainst with anti-islamic words while being assaulted." (*See id.* at 4.)  The Amended Complaint lists the basis for the Court's jurisdiction as 18 U.S.C. § 242.[2] (*See id.* at 3.)

The matter was transferred to the undersigned on April 11, 2022.  (ECF No. 66.)

On September 28, 2023, Defendants filed the instant summary judgment motion.  (ECF No. 76.)  Plaintiff did not submit an opposition brief, and on March 25, 2024, the Court provided Plaintiff with 21 days to submit an opposition brief and warned him that Defendants' motion would be treated as unopposed if he failed to respond.  (ECF No. 77.)  Plaintiff did not respond to that Order.

---

[2] The Magistrate Judge subsequently denied Plaintiff's later request to amend his complaint to add additional claims and defendants.  (ECF Nos. 67, 74.)

## II.     <u>STANDARD OF REVIEW</u>

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  "If reasonable minds could differ as to the import of the evidence," summary judgment is not appropriate. *See id.* at 250-51.  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists and summary judgment shall be granted.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

Where, as here, a motion for summary judgment is unopposed, and Plaintiff has not filed a responsive brief, Local Rules 7.6 and 56.1 give this Court the power to deem the summary judgment motion unopposed.  *See Taylor v. Harrisburg Area Community College*, 579 F. App'x. 90, 93 (3d Cir. 2014) (noting that the District Court granted summary judgment after conducting "a thorough review of the record").  Nevertheless, Fed. R. Civ. P. 56(e)(3) "still requires the Court

to satisfy itself that summary judgment is proper because there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law." *Ruth v. Selective Ins. Co. of Am.*, No. 15-2616, 2017 WL 592146, at *2 (D.N.J. Feb. 14, 2017); *see also Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) (failure to respond to a summary judgment motion "is not alone a sufficient basis for the entry of a summary judgment").  Failure to oppose the motion does mean, however, that the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Id.* at 175.

### III.  <u>DISCUSSION</u>

#### a.  **Plaintiff's Claim Brought Pursuant to 18 U.S.C. § 242**

Defendants first argue that they are entitled to judgment as a matter of law on Plaintiff's claim that the use of excessive force by Defendants violated his rights under 18 U.S.C. § 242, which is a statute providing criminal penalties for deprivation of rights under color of law. Defendants also note that this is the only claim asserted in Plaintiff's Amended Complaint.  The Court agrees with Defendants that 18 U.S.C. § 242 does not give rise to a private right of action. *See Mikhail v. Khan*, 991 F. Supp.2d 596, 639 (E.D. Pa. 2017) aff'd, 572 F. App'x 68 (3d Cir. 2014) (citing *Carpenter v. Ashby*, 351 F. App'x 684, 688 (3d Cir. 2009) ("[W]e agree with the District Court's dismissal of the 18 U.S.C. § 241 and § 242 claims.  Neither statute creates a civil cause of action.")).  The Court therefore grants summary judgment to Defendants on Plaintiff's claim brought pursuant to 18 U.S.C. § 242.

The Court will next address Plaintiff's § 1983 claims though Plaintiff failed to reallege his § 1983 claims in his Amended Complaint.  Because Plaintiff is proceeding pro se, the Court must apply the applicable law, irrespective of whether the pro se litigant has mentioned it by name.  *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003) (citing *Higgins v. Beyer*, 293 F.3d

683, 688 (3d Cir. 2002) (internal quotations omitted).  Here, Plaintiff raised his excessive force claim under 42 U.S.C. § 1983 in his prior Complaint, and the proper statutory basis for Plaintiff's excessive force claim is § 1983.  As such, the Court will next address whether Defendants are entitled to judgment as a matter of law on that claim and his other claims brought pursuant to § 1983.

### b.  Plaintiff's Claims Brought Pursuant to 42 U.S.C. § 1983

Plaintiff's constitutional claims are governed by 42 U.S.C. § 1983, which provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

*See* 42 U.S.C. § 1983.  Section 1983 is a remedial statute designed to redress deprivations of rights secured by the Constitution and its subordinate federal laws.  *See Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).  A plaintiff must demonstrate two essential elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privileges secured by the Constitution or the laws of the United States" and (2) that plaintiff was deprived of his rights by a person acting under the color of state law.  *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 464 (3d Cir. 1989); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

### 1.  Plaintiff's Fourteenth Amendment Excessive Force Claim

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claim.  The Defendants construe Plaintiff to limit his excessive force claim to the altercation in the Constant Watch section of MCCI.  Plaintiff has not opposed summary judgment or clarified the scope of his claims in his deposition, and, therefore, the Court accepts

Defendants' interpretation and addresses only the incident in the Constant Watch area.[3]  For the reasons explained below, summary judgment is denied on the excessive force claims with respect to the Defendants' use of force in the Constant Watch area.

As noted above, Plaintiff did not file an opposition brief or respond to the Court's order directing him to do so or risk having the motion treated as unopposed.  Nevertheless, Plaintiff is proceeding pro se, and his deposition testimony and the surveillance video are part of the summary judgment record that the Court must consider in deciding whether Defendants are entitled to summary judgment as a matter of law.  *See Salaam v. Merlin*, Civ. No. 08-1248 2010 WL 2545951, *6 (D.N.J. Jun. 18, 2010) (denying unopposed summary judgment motion as to plaintiff's excessive force claim on the basis of testimony provided in his deposition); *see also Melvin v. Astbury*, Civ. No. 05-771, 2008 WL 5416384, *6 n. 3 (D.N.J. Dec. 22, 2008) (denying summary judgment on excessive force claim where evidence relied on by defendant was self-prepared police reports) (overruled on other grounds in *Pearson v. Callahan*, 555 U.S. 223 (2009).  As explained by the District Court in *Salaam*:

> Although it is unusual to deny an unopposed motion, it is not "appropriate" to grant summary judgment on the excessive force claim.  This is true because, as noted above, the evidentiary materials submitted by the moving Defendants themselves contain admissible evidence—including Plaintiff's sworn testimony of how the stomping, dragging, and striking the railing occurred—that raises genuine issues of material fact.  This circumstance was foreseen by the drafters of the original Rule 56(e), Fed. R. Civ. P., which survives unchanged in this respect in Rule 56(e)(2), where the Advisory Committee on Civil Rules noted the circumstances in which granting unopposed summary judgment might be inappropriate, stating: "Where the evidentiary matter in support of

---

[3] Even if Plaintiff did seek to raise an excessive force claim arising from his brief altercation with Defendants in the booking room, Plaintiff's sudden movement toward the female prisoner and/or the open door in the booking room justified the minimal use of force by Defendants to secure him, and the video evidence does not support Plaintiff's claim that he was punched or kicked during that very brief interaction.

> the motion does not establish the absence of a genuine issue,
> summary judgment must be denied even if no opposing evidentiary
> matter is presented." Notes of the Advisory Committee (1963
> amdt.).

*Salaam*, 2010 WL 2545951, at *4.  The same is true in this case, as the record includes Plaintiff's

sworn deposition testimony that Defendants assaulted him after he fell to the ground in the constant

watch cell even though he was not resisting their attempts to secure him.  As explained below,

Plaintiff's deposition testimony contradicts Defendants' version of events in the constant watch

cell.  Moreover, the video evidence shows Defendants using considerable force on Plaintiff in the

constant watch cell, and it is not clear from the video evidence whether the amount of force they

used was justified.

Plaintiff's excessive force claims arise under the Fourteenth Amendment.  Unlike a

convicted prisoner, "a pretrial detainee must show <u>only</u> that the force purposely or knowingly used

against him was objectively unreasonable." *Jacobs v. Cumberland Cnty.*, 8 F.4th 187, 194 (3d Cir.

2021) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015) (emphasis in *Jacobs*).

Objective reasonableness turns on the "facts and circumstances of each particular case." *Kingsley*,

576 U.S. at 397 (citation and quotation omitted).  "A court must make this determination from the

perspective of a reasonable officer on the scene, including what the officer knew at the time, not

with the 20/20 vision of hindsight." *Id.* (citation omitted).  Those circumstances include "the

relationship between the need for the use of force and the amount of force used; the extent of the

plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the

severity of the security problem at issue; the threat reasonably perceived by the officer; and

whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.  "Thus, a court must

consider the legitimate interests that stem from the government's need to manage the facility in

which the individual is detained, appropriately deferring to policies and practices that in the

judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (quotations omitted) (citing *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment excessive force claims because the undisputed facts show that Plaintiff resisted the efforts of Defendants to secure him in the constant watch cell and that they were justified in using force until he stopped resisting.

Defendants emphasize throughout their brief that Plaintiff is not a reliable narrator due to his self-proclaimed drug use and PTSD. That issue, however, is for the jury, and the Court is not permitted to assess Plaintiff's credibility at summary judgment and must instead view the evidence in the light most favorable to him. Defendants also rely heavily on Sergeant Gall's affidavit and the surveillance video, but Plaintiff's version of events, as set forth in his deposition testimony, are not blatantly contradicted by the video evidence to warrant summary judgment in favor of Defendants.

In *Jacobs*, 8 F.4th at 192, the Third Circuit succinctly summarized the standard in cases involving security footage:

> At summary judgment, a district court must construe the evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018). . . . But the existence of a security video presents an "added wrinkle." *Id.* at 378. In cases where there is a reliable video depicting the events in question, courts must not adopt a version of the facts that is "blatantly contradicted" by the video footage. *Id.* at 380.

*Id.* (cleaned up). Here, the video surveillance of the constant watch cell shows Defendants used considerable force, including punching and deploying ARS, and does not clearly show that Plaintiff was resisting the officers attempts to secure him. A reasonable jury could find that Plaintiff fell because he was dropped and did not fall to resist Defendants' efforts to secure him.

The surveillance video next shows Defendants converge on Plaintiff, and the Court is unable to determine if Plaintiff was resisting the officers attempts to secure him.  The video does clearly show several Defendants striking Plaintiff repeatedly and also shows Gall deploying ARS to Plaintiff's face.  Moreover, even though Plaintiff need not show that Defendants acted with malice, a jury could credit Plaintiff's testimony that the officers made offensive comments during the assault and find that they used more force than necessary due to bias or frustration with Plaintiff.

Defendants also argue that the events leading up to the assault show that their use of force was reasonable.  Defendants contend that Plaintiff ingested a large quantity of LSD and an unknown quantity of heroin, behaved erratically during the booking process, briefly lunged toward an open door and/or a female prisoner, and then refused to walk to Constant Watch.  At Constant Watch, Defendants claim that Plaintiff shouted at medical staff.  In his deposition, Plaintiff appears to admit that he has no independent recollection of much of what occurred, but he denies refusing to walk to Constant Watch or resisting Defendants attempts to secure him in the constant watch cell.  And even if a reasonable jury believed that Plaintiff acted erratically at booking, refused to walk under his own power, and shouted during his medical evaluation, they could still find that Plaintiff did not resist Defendants' efforts to secure him in the constant watch cell.

A reasonable jury could find that striking Plaintiff numerous times, causing significant blood loss, and subsequently deploying ARS spray to his face was objectively unreasonable based on his lack of resistance.  Alternatively, they could find that Defendants' response was unreasonable in comparison to any resistance Plaintiff may have offered.  And if the jurors accept Plaintiff's version of the events, they could conclude that he did not represent a threat to jail security or the Defendants' safety.  *See Jacobs*, 8 F.4th at 195 (explaining that use of force occurred 15 minutes after fight among inmates had ended and the circumstances were calm).  A jury could

14

also find that the decision to use force against Plaintiff by striking him and deploying ARS was "wholly gratuitous and objectively unreasonable." *Id.* at 195–96.

In short, the version of events offered by Defendants differs from the version offered by Plaintiff in his deposition, and the surveillance video does not definitively resolve these disputed material facts. Under the circumstances presented, there remain genuine disputes of material fact with respect to the relationship between the need for the use of force and the amount of force used, the extent of the Plaintiff's injury, the severity of the security problem at issue, the threat reasonably perceived by the officers, and whether the Plaintiff's conduct justified the use of force. *See Kingsley*, 576 U.S. at 397. For these reasons, Defendants are not entitled to summary judgment on the Fourteenth Amendment excessive force claim.

### 2.   **The Equal Protection and First Amendment Retaliation Claims**

Although it denies summary judgment on the Fourteenth Amendment excessive force claims, the Court grants summary judgment to Defendants on Plaintiff's Fourteenth Amendment equal protection and the First Amendment retaliation claims, brought pursuant to § 1983, because there is insufficient evidence to survive summary judgment on these claims.

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To prevail on an equal protection claim, a plaintiff must present evidence that he or she has been treated differently from persons who are similarly situated. *See City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). The Court assumes that Plaintiff's equal protection claim is premised on Defendants' comments about Plaintiff's race and religion during the assault. Defendants are entitled to summary judgment on the equal protection claim because there is no evidence before the Court that Defendants treated Plaintiff

differently from other similarly situated prisoners based on his race or religion.  Even accepting Plaintiff's version of events as true, the comments, standing alone, do not make out an equal protection claim, and Defendants are entitled to judgment as a matter of law on Plaintiff's equal protection claim.

Nor do the comments support a First Amendment retaliation claim.  Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional.  *See, e.g., Mitchell v. Horn*, 318 F.3d 523, 529–31 (3d Cir. 2003); *Rauser v. Horn*, 241 F.3d 330, 333–34 (3d Cir. 2001); *Allah v. Seiverling*, 229 F.3d 220, 224–26 (3d Cir. 2000).  To establish a prima facie retaliation claim under 42 U.S.C. § 1983, a plaintiff "must prove that: (1) his conduct was constitutionally protected; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).  With respect to the third element, "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334.

Here, Plaintiff fails to provide any evidence that Defendants assaulted him in retaliation for his exercise of his First Amendment rights, i.e., for practicing his religion or for other protected conduct.  The Court again credits Plaintiff's claim that one or more of the Defendants made derogatory comments about Plaintiff's race and religion during the assault, but Plaintiff has not shown that the assault was motivated by Plaintiff's religious exercise or other First Amendment activity. *See, e.g., Rauser*, 241 F.3d at 333-334 (defendants not entitled to summary judgment where evidence showed they denied plaintiff parole, transferred him to a distant prison, and

16

penalized him financially because he refused to participate in a religious addiction program).  As such, Defendants are entitled to summary judgment on this claim as a matter of law.

**IV.**   **CONCLUSION**

For the reasons stated in this Opinion, Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**.  (ECF No. 76.)  The Court grants summary judgment in favor of Defendants as to Plaintiff's claims brought pursuant to 18 U.S.C. § 242, as well as Plaintiff's Fourteenth Amendment equal protection and First Amendment Retaliation claims, which are brought pursuant to § 1983.  The Court denies summary judgment as to the Fourteenth Amendment excessive force claim, which is brought pursuant to § 1983.  An appropriate Order follows.

DATED: April 30, 2024

GEORGETTE CASTNER
United States District Judge

17